7393

EX *PARTE* CAROLINA, CLINCHFIELD & OHIO RAILWAY v. ·R. M. McCOWN, SECRETARY OF STATE.

CONSTITUTIONAL LAW—FOREIGN CORPORATIONS—WORDS AND PHRASES.—
The Act, 26 STAT., 54, providing for a more practical method of incorporating in this State the owners or projectors of railroad companies incorporated under the laws of 'other States or countries held to be in violation of the provisions of section 8 of article IX of the State Constitution.
"*Railroads*," "*Railroad Corporations*," "*Owners or ·Projectors*" *defined.*
Mr. CHIEF JUSTICE JONES *and* JUDGES PRINCE, MEMMINGER, ALDRICH *and* SHIPP *dissent.*

Petition in the original jurisdiction of this Court by Caro-.lina, Clinchfield and Ohio Railway, George L. Carter, Archer A. Phlegar and William H. Lyles, for writ of mandamus to require R. M. McCown, as Secretary of State, to file their petition and issue to them a charter to build a railroad in this State. The case was first heard before this Court on October 12, 1909. But the Court being divided, it was ordered to be reargued before the Court *en banc* on November 27, 1909.

*Messrs. James Byrne, J. Norment Powell; Lyles & Lyles, H. B. Carlisle, B. L. Abney, F. H. Weston* and *R. W. Shand,* for petitioners.

*Messrs. Byrne, Powell* and *Lyles & Lyles,* cite: *As to the construction of the statute:* 48 S. C., 49; 64 S. C., 139, 162;

36 S. E., 1024; 80 S. C., 355; 105 U. S., 667; 187 U. S., 547; 16 S. E., 347; 61 Fed., 592; 75 Fed., 433. *A foreign corporation may be made a domestic corporation by statute:* 174 U. S., 552. *The Tompkins case accords with the adjudications of other States:* 70 S. W., 857; 75 S. W., 275; 26 S. E., 269; 39 N. E., 47; 40 S. E., 91; 8 Fed., 794; 104 Fed., 377; 75 S. W., 725. *If more than one construction, the act should be preserved:* 12 Tet., 72; 112 U. S., 261; 170 N. Y., 327; 19 N. J. Eq., 245. *The intention is to be sought in necessity for act:* 54 N. Y., 43; 42 N. J. L., 125; 157 U. S., 1.

*Attorney General J. Fraser Lyon* and *Assistant Attorney General M. P. DeBruhl,* contra, cite: *As to construction of Constitution*: Cool. Con. Lim., 89; 16 S. C., 52; 6 Ency., 921, 922, 925; 87 Ill., 385; 48 S. C., 52. *The act, 1909, 26 Stat., 54, violates the main purpose and intent of sec. 8, art. IX, of Con.:* 161 U. S., 545; 174 U. S., 552; 161 U. S., 562; 190 U. S., 226; 107 U. S., 581; 166 Fed., 850; 48 S. C., 49; 53 S. C., 246; 64 S. C., 164; 82 S. C., 127.

November 27, 1909.   The opinion of the Court was delivered by

MR. JUSTICE GARY.   This is an application to the Court, in the exercise of its original jurisdiction, for a writ of mandamus, requiring the Secretary of State to accept and file a copy of the charter of the Carolina, Clinchfield and Ohio Railway, and to issue to the petitioners a charter under section 1 of an act entitled "An act to amend sections 1, 3 and 6 of an act entitled 'An act to provide the manner in which owners or projectors of any railroad companies, incorporated under the laws of other States or countries, may become incorporated in this State,' approved February 25, 1902, so as to provide a more practical method for the incorporation of such companies and their stockholders, owners or projectors."

The sole question is, whether that act is unconstitutional, on the ground that it is in violation of section 8, article IX of the Constitution of South Carolina, which is as follows:

"The General Assembly shall not grant to any foreign corporation or association a license to build, operate or lease any railroad in this State; but in all cases where a railroad is to be built or operated, or is now being operated, in this State, and the same shall be partly in this State and partly in another State, or in other States, the owners or projectors thereof, shall first become incorporated under the laws of this State; nor shall any foreign corporation or association lease or operate any railroad in this State, or purchase the same or any interest therein. Consolidation of any railroad lines, and corporations in this State with others, shall be allowed only where the consolidated company shall become a domestic corporation of this State. No general or special law shall ever be passed, for the benefit of any foreign corporation operating a railroad under any existing license of this State, or under any existing lease, and no grant of any right or privilege, and no exemption from any burden, shall be made to any such foreign corporation, except upon the condition that the owners or stockholders thereof shall first organize a corporation in this State, under the laws thereof, and shall thereafter operate and manage the same and the business thereof, under said domestic charter."

Section 1 of the act hereinbefore mentioned is as follows: "That each and every railroad company or railroad corporation, created or organized under or by virtue of the laws of any government or State, other than this State, and the stockholders, owners or projectors thereof, desiring to own property or carry on business, or exercise any corporate fanchises in this State whatsoever, shall first apply for and obtain a charter, and become incorporated as a corporation of this State, in the following manner, that is to say: Said corporation and the stockholders, owners or projectors thereof, shall file or cause to be filed in the office of the

Secretary of State, a copy of the charter of said corporation, duly authenticated in the manner directed by law for the authentication of the statutes of the State or country, under whose laws such corporation is chartered or organized, accompanied by a petition, signed on behalf of said company by its president and secretary, and by one or more of the stockholders of said company, setting forth: (1) the name of the company or corporation and the State or government under the laws of which it was created or organized; (2) the residence of the stockholder or stockholders joining in the petition; (3) the place at which the company has its principal place of business, and the place at which it is proposed to maintain a principal office or place of business in this State; (4) the total authorized capital stock of such company; (5) that the company or corporation, by its said officers and the stockholder or stockholders signing the petition, thereby apply on behalf of the corporation, and on behalf of all its stockholders, owners and projectors, to be incorporated under the laws of the State of South Carolina, with power to own property and carry on business, and exercise the corporate franchises of said company in this State, as a railroad corporation organized under the laws of South Carolina; (6) any other matter which it may be desirable to set forth in said petition. At least one of the stockholders signing said petition, shall be a resident of this State. Upon the filing of said petition and of the copy of the charter of said company, and the payment of the filing fees fixed by law, and the charter fees provided in section 4 of this act, the Secretary of State shall issue a certificate to said corporation or company, and the stockholders, owners or projectors thereof, to be known as a charter, that the said corporation or company and the stockholders, owners or projectors thereof have been fully organized and incorporated under the laws of South Carolina, under the name and for the purposes indicated in said petition. * * *

"When the Secretary of State issues such a certificate, such foreign railroad corporation and its stockholders, owners and projectors shall *ipso facto* become a domestic corporation, and shall *ipso facto* be incorporated under the laws of this State, and shall enjoy the rights, and be subject to the liabilities of a domestic corporation, and may sue and be sued in the Courts of this State, and shall be subject to the jurisdiction of this State as a corporation, created under the laws of the State of South Carolina."

"What was the intention of the framers of the Constitution in adopting section 8 article IX? ' The main object was to require foreign railroad companies, operating or seeking to operate railroads in this State, to be placed on the same footing with domestic corporations as to their rights and liabilities, under the jurisdiction of the State Courts." This is the language of the Court in *R. R.* v. *Tompkins,* 48 S. C., 49, 25 S. E., 982, and it assigns the only reasonable ground for inserting this section in the Constitution.

In the case of *R. R.* v. *James,* 161 U. S., 545, the Court pointed out the manner in which this result could be accomplished, when it said: "In order to bring such an artificial body as a corporation, within the spirit and letter of that Constitution, as construed by the decisions of this Court, it would be necessary to create it out of natural persons whose citizenship of the State creating it would be imputed to the corporation itself."

The evident intention of the framers of the Constitution was to require compliance with this principle, by providing that "in all cases where a railroad is to be built or operated, or is now being operated in this State, and the same shall be partly in this State and partly in another State, the *owners* or *projectors* thereof, shall first become incorporated under the laws of this State."

And by the further provision that "no grant of any right or privilege, and no exemption from any burden shall be made to any such foreign corporation, except upon the con-

dition that the *owners* or *stockholders* thereof shall first organize a corporation in this State, under the laws thereof, and shall thereafter operate and manage the same and the business thereof under *said* domestic charter."

It will thus be seen that the intention that the corporation should be "created out of natural persons, whose citizenship of the State creating it would be imputed to the corporation itself," is not only shown by the use of the words "projectors," "owners" and "stockholders," but by the word "said," before the words "domestic corporation," which refer to a corporation composed of "owners" or "stockholders."

There are no words in the section of the Constitution hereinbefore mentioned, showing that the provision as to the incorporation of the projectors, owners or stockholders, was intended otherwise than in an exclusive sense.

When we turn to the act of 1909, we find that it not only provides for the incorporation of natural persons, but likewise of artificial bodies created by other States. If the act provided alone for the incorporation of artificial bodies, citizenship of the States creating the foreign corporations would be imputed to them. *Calvert* v. *Ry.,* 64 S. C., 139, 36 S. E., 750; *Wilson* v. *Ry.,* 64 S. C., 162, 36 S. E., 701; *R. R.* v. *Allison,* 23 Sup. Ct. Rep., 713.

We do not feel called upon to determine whether citizenship of the State creating the corporation would be imputed to it when incorporated along with natural persons, for the reason that the Constitution prohibits the granting of a charter to any except natural persons, and such question would be merely speculative.

It may be a great hardship to the petitioners to refuse the writ, but this Court can only construe the Constitution and statutes as it finds them.

It is the judgment of this Court, that the wit of mandamus be refused, and that the petition be dismissed, with costs.

Messrs. Associate Justices Woods, and Hydrick and
Circuit Judges, Gary, Klugh, Gage, Dantzler and
Wilson concur in this opinion.

Judge Watts concurs in this opinion and also in the sepa-
rate opinion of Mr. Justice Hydrick.

Judge DeVore concurs in the result.

Mr. Justice Hydrick, concurring. I concur in the
opinion of Mr. Justice Gary, for the reasons therein stated.
I desire, however, to add a few suggestions, which, I think,
tend to strengthen the conclusion that the act of 1909 vio-
lates the Constitution.

To ascertain the *intention* of the framers of the Constitu-
tion, we must consider first the language used and give it its
natural and ordinary meaning. If it is plain and unambigu-
ous, there is no room for the application of the artificial rules
of construction. If it is of doubtful meaning, we may read
it in the light of events which led to its adoption, consider-
ing the evils sought to be remedied. We may, also, call to
our aid the contemporaneous construction given the section
by the legislature and the courts. The different parts of the
same section and other sections of the same article of the
Constitution should also be compared, so that effect shall be
given, if practicable, to every part, section, clause and word
in it (if that can be done by any reasonable method of con-
struction to make it harmonize with the whole), for it must
be presumed that, in framing an instrument of so much
importance, the language used to express the intention was
selected with care and deliberation.

Examining the section under consideration in the light of
these well settled principles of construction, we find no
authority to the legislature to *adopt* or *domesticate* a foreign
corporation; in other words, no authority to make a foreign
corporation a domestic corporation by merely legislative fiat.

On the contrary, the method by which those interested in a foreign corporation, desiring to enter the State for the purpose of building or operating a railroad, shall be incorporated in this State, is not left to the legislature, but is designated in the Constitution.

In their natural and ordinary signification, the words "owners," "projectors" and "stockholders" refer to the persons or individuals who own or project the railroad, or own or hold the stock of the foreign corporation interested in building or operating it.

By the terms of the Constitution, the "owners" or "projectors" of the railroad "shall first become incorporated under the laws of this State."

We do not ordinarily speak of incorporating a corporation, nor say that a corporation shall be incorporated. It seems, therefore, a strained construction of these words to say that a foreign corporation, being the owner of a railroad to be build into this State, might have been included in the words "owners" or "projectors," for the language of the section shows an intent to distinguish between the "owners" or "projectors" or "stockholders" and the corporation, as a distinct entity. Nor can it be said that the framers of the Constitution had in mind and understood that a foreign corporation might be a subscriber to the capital stock of another corporation desiring to build such a railroad; for section 19 of the same article deals with that subject, and prohibits any evasion of the prohibition contained in section 8, by the owning or holding, directly or indirectly, by *any* corporation of the capital stock, or bonds having voting power of any railroad doing business in this State. That section reads as follows: "Nothing prohibited in this article shall be permitted to be done by any corporation or company, persons or person, either for its or their own benefit, or otherwise, by its or their holding or controlling in its or their own name or otherwise, or in the name of any other person or persons, or other corporation or company whatso-

ever, a majority of the capital stock, or of bonds having
voting power, of any railroad or transportation company,
or corporation created by or existing under the laws of this
State, or doing business within this State."

Let us consider, next, this language used in the latter part
of the section: "No general or special law shall ever be
passed for the benefit of any foreign corporation operating a
railroad under any existing license of this State or under
existing lease, and no grant of any right or privilege and no
exemption from any burden shall be made to any such for-
eign corporation, except upon the condition that the owners
or stockholders thereof shall first organize a corporation in
this State under the laws thereof, and shall thereafter
operate and manage the same and the business thereof
under said domestic charter."

It is argued that the use of the words "under any *existing*
license" and "under any *existing* lease," makes this part of
the section inapplicable to the consideration of the first part,
which refers to corporations which are not *yet* doing busi-
ness in the State, but only seeking to enter the State, and
that the words *"such* foreign corporations" limit this part of
the section to those foreign corporations already doing busi-
ness under an *existing* license or lease. While this con-
struction may be sound as to the passage of any law, general
or special, for the benefit of such corporation, or the grant-
ing of any right or privilege or exemption from any burden,
still it is difficult to perceive any reason why the framers of
the Constitution should prescribe one method of incorpora-
tion of the "owners or projectors" of a railroad, owned by a
foreign corporation, seeking to enter the State, and a differ-
ent method for the "owners or stockholders" of a foreign
corporation, already doing business in the State, which seeks
the grant of some right or privilege or exemption from some
burden, which the legislature is prohibited from granting,
"except upon the condition that the owners or stockholders
thereof shall first organize a corporation in this State, under

the laws thereof." Why should there be any distinction? It.seems from a consideration of the whole section, that the intention is manifest of dealing with both classes as to the manner of incorporation in exactly the same way, to wit, that they shall become incorporated under the laws of this State. That being so, what are we to understand by the use of the word "organize," when it is said that "the owners or stockholders thereof shall first *organize* a corporation in this State, under the laws thereof?" Giving the word its ordinary and natural meaning, we find no difficulty in getting at the intention. In *Walton* v. *Oliver,* 49 Kan., 112, it was said: "The words *organize* or *organization* have a well understood meaning; and as we construe them they mean the election of officers, providing for the subscription and payment of the capital stock, the adoption of by-laws, and such other steps as are necessary to endow the legal entity with the capacity to transact the legitimate business for which it was created." To the same effect see *Com.* v. *William Mann Co.,* 150 Pa. St., 70.

The use of the word "organize" is incompatible with the idea of *adoping* or *domesticating* a foreign corporation by legislative fiat. In that event, no organization is necessary. The corporation is already organized. It will be noticed that no *organization* is provided for by the act 1909.

Section 11 of the same article reads as follows: "The General Assembly shall provide by law for the election of directors, trustees or managers of all corporations so that each stockholder shall be allowed to cast, in person or by proxy, as many votes as the number of shares he owns multiplied by the number of directors, trustees or managers to be elected, the same to be cast for any one candidate or to be distributed among two or more candidates." The act of 1909 makes no provision whatever for the election of directors, trustees or managers of the corporations which may be created thereunder and the voting of the stock, as required by the foregoing section, and, therefore, it clearly violates

that section of the Constitution. That ground of objection to the act is not made in this case, and it is alluded to merely for the purpose of showing what was the *intention* of the framers of the Constitution as to *how* those who own, project, build, operate, or lease railroads in this State shall be incorporated.

It seems clear, therefore, from a consideration of the language used that the Constitution intended that a *new* corporation should be created and *organized* in this State out of the natural persons interested in building or operating a railroad in this State.

Let us next inquire what purpose the framers of the Constitution had in view in adopting the section under consideration.

In *Southern Ry.* v. *Tompkins,* 48 S. C., 49, at page 52, 25 S. E., 982, the Court said: "What was the *intention* of the framers of the Constitution in adopting section 8, of article IX? The main object was to require foreign railroad companies operating or seeking to operate railroads in this State to be placed on the same footing with domestic corporations, as to their rights and liabilities under the jurisdiction of the State Courts."

The many and sharp contests which had taken place in the Courts over the removal of cases from the State Courts to the Federal Courts, of which we may take judicial notice, the various acts of the legislature passed in pursuance of the section under consideration, and the language of the section itself, point unmistakably to the conclusion that it was adopted with the intention of requiring all railroad corporations doing business, or desiring to do business in this State, to become incorporated under the laws of this State, in such manner as to make them *citizens* of this State, and thereby prevent them from removing cases brought against them by citizens of this State into the Federal Courts. If that was not the purpose and intention, it seems to me the constitutional convention took great pains to frame a section which

amounts to nothing. If that was the purpose and intention, and there can be no doubt it was, then, how can it be said that the question whether the corporation is so created and organized as to prevent the removal of cases to the Federal Courts on the ground of diverse citizenship is irrelevant to the discussion?

Having ascertained the intention, it is the plain duty of the Court to construe the act of 1909 in the light of that intention. Having done so, it seems clear that the act falls far short of the requirements of the Constitution, and not only violates its spirit and intent, but also its plain and positive prohibition; for, *in effect,* it does nothing but grant to a foreign corporation a license to build and operate a railroad in this State. It is said that the corporation created by the act of 1909 is a *new* and distinct entity. If that be so, who are its stockholders? Who are the directors, president and secretary? How is it *organized?* And were its officers elected in the manner prescribed by section 11, of article IX, of the constitution, and sec. 1846, Code, 1902, passed to carry into effect that provision? How can it be said that such a corporation is created and *organized* in the manner prescribed by the Constitution?

In the view which I take of the proper meaning and construction of the Constitution, the case of *Southern Ry.* v. *Tompkins* was erroneously decided, and should be overruled, as clearly pointed out by Judge Watts in his concurring opinion in *Wilson* v. *Ry., 64 S. C., 169, 36 S. E., 701.*

MR. CHIEF JUSTICE JONES, *dissenting.* Petitioners make application in the original jurisdiction of the Court for writ of mandamus requiring respondent as Secretary of State to accept and file the copy of the charter of the Carolina, Clinchfield & Ohio Railway, tendered to him with a petition for charter and to issue to petitioners a certificate to be known as a charter as prescribed by section 1 of act of 1909, 26 Stat., 54, entitled "An Act to amend sections 1, 3 and 6

of an Act entitled, 'An Act to provide the manner in which owners or projectors of any railroad companies incorporated under the laws of other States. or countries .may ·become incorporated in this State,' approved February 25, 1902, so as to provide a more practical method for the incorporation of such companies and their stockholders, owners or projectors."

The petitioners, both in the petition to the Secretary of State and in the petition to this Court, set forth all the facts showing full compliance with all, the requirements of said statute.

Respondents demur to the petition on the ground that it fails to state facts sufficient to constitute a cause of action on two grounds:

(a) "It appears that the petitioner, the Carolina, Clinchfield & Ohio Railway, is a foreign corporation organized under the laws of the State of Virginia, and is endeavoring to procure a license to build, own and operate a railroad in this State.

(b) "That the statute above mentioned is unconstitutional in that it violates article IX, section 8 of the Constitution, which expressly forbids the General Assembly to license any foreign corporation or association to build, operate or lease any railroad in this State."

The petition shows that the petitioner, Carolina, Clinchfield & Ohio Railway is a railroad corporation duly created and organized under the laws of the State of Virginia, and having the authority under its charter and the said law to extend its lines into this State and to do the acts and things herein sought to be done, and that petitioners, Geo. L. Carter, Archer A. Phlegar and William H. Lyles, are stockholders of the said corporation, the said G. L. Carter residing at Johnson City, in the State of Tennessee, the said A. A. Phlegar residing at Bristol, in the State of Virginia, and the said W. H. Lyles residing at Columbia, in the State of South Carolina, and being a citizen of the State of South Carolina.

The petition further shows that petitioners, desiring to own property and carry on business and exercise corporate franchises in the State of South Carolina, especially to construct, own and operate a railroad, which would be an extension of the line of railroad of the petitioner, Carolina, Clinchfield & Ohio Railway, now owned and operated in the State of Virginia, Tennessee and North Carolina, with the authority, consent and approval of the board of directors, and all of the stockholders of the Carolina, Clinchfield & Ohio Railway, filed in the office of the Secretary of State of South Carolina, a petition of which a true copy, including the signatures is hereto annexed, setting forth all of the facts stated in said petition being true to the knowledge of petitioners, and the petition, so filed, was in all respects in full compliance with the provisions of said act. The petition further shows that all the fees required by law in the premises were tendered to the secretary and demand made for the issuance of a charter as required of said act, and that the Secretary of State refused to comply on the ground that said act violated section 8, article IX of the State Constitution.

Other facts appearing are that the Carolina, Clinchfield & Ohio Railway has an authorized capital stock of the par value of $30,000,000, and have constructed and under construction a line of railway from a point at or near Dante, in Russell county, Virginia, to a point in Rutherford county, North Carolina, on the boundary line between North Carolina and South Carolina, at or near a point south of Island Ford Ferry of Broad River, and that said railroad company and the stockholders and owners thereof desire to extend the line of said company into the State of South Carolina, from the said boundary line between North Carolina and South Carolina, to the city of Spartanburg, in South Carolina, and that it is the purpose to maintain a principal office as place of business in said city of Spartanburg. The petition to the Secretary of State is signed by the Carolina, Clinch-

field & Ohio Railway by George L. Carter as president, corporate seal attached, and attested by the signature of Jerry C. Stone as secretary, and it is also signed individually by George L. Carter, Archer A. Phlegar and William H. Lyles.

Section 1 of the statute in question provides: Section 1. "Be it enacted by the General Assembly of the State of South Carolina, that each and every railroad company or railroad corporation created or organized under or by virtue of the laws of any government or State other than this State and the stockholders, owners or projectors thereof, desiring to own property or carry on business or exercise any corporate franchises in this State whatsoever, shall first apply for and obtain a charter and become incorporated as a corporation of this State in the following manner, that is to say: Said corporation and the stockholders, owners or projectors thereof shall file or cause to be filed in the office of the Secretary of State a copy of the charter of said corporation, duly authenticated in the manner directed by law for the authentication of the statutes of the State or country under whose laws such corporation is chartered or organized, accompanied by a petition signed on behalf of said company by its president and secretary and one or more of the stockholders of said company, setting forth: (1) the name of the company or corporation and the State or government under the laws of which it was created or organized; (2) the residence of the stockholder or stockholders joining in the petition; (3) the place at which the company has its principal business and the place at which it is proposed to maintain a principal office of business in this State; (4) the total authorized capital stock of such company; (5) that the company or corporation by its said officers and the stockholder or stockholders signing the petition thereby apply on behalf of the corporation and on behalf of all its stockholders, owners and projectors to be incorporated under the laws of this State of South Carolina,

with power to own property and carry on business and exercise the corporate franchises of said company in this State as a railroad corporation organized under the laws of South Carolina; (6) any other matter which it may be desirable to set forth in said petition. At least one of the stockholders signing said petition shall be a resident of this State. Upon the filing of said petition and of the copy of the charter of said company and the payment of the filing fees fixed by law and the charter fees provided in section 4 of this act, the Secretary of State shall issue a certificate to said corporation or company, and the stockholders, owners or projectors thereof to be known as a charter, that the said corporation or company and the stockholders, owners and projectors thereof, have been fully organized and incorporated under the laws of South Carolina under the name and for the purposes indicated in said petition, with the powers given by or under such charter on file with the Secretary of State, not inconsistent with the laws of this State, including power to acquire or purchase on such terms as shall be agreed upon, from any other corporation or owner or owners or at judicial or foreclosure or other sale, and to build, lease, own and operate lines of railway and other property in this State, with all rights, powers, immunities, privileges and franchises thereto belonging, and to carry on its business and exercise its corporate franchises in this State, and to hold its meetings of stockholders and directors, and to make contracts and conduct its business within or without this State, but in all cases such certificates shall contain the further provision that such company is a body politic or corporate and as such may sue and be sued in any of the Courts of this State, and shall be entitled to all the rights and privileges and subject to all the liabilities of railroad corporations embraced in what is called the General Railroad Law, being chapter L of volume 1 of the Code of Laws of South Carolina, 1902, and the acts amendatory thereof, as well as any acts now existing or hereafter to be passed regulating the

duties, privileges and liabilities of railroad companies. The petition and said certificate shall be recorded by the Secretary of State in books kept by him for that purpose, and a copy of said certificate, and a copy of said charter, filed in the office of the Secretary of State, as aforesaid, shall be recorded in the office of the register of mesne conveyances or Clerk of the Court of Common Pleas in each county in this State in which the proposed line of such corporation or company is or will be situate.  .

"No irregularity in complying with the provisions of this act shall be held to vitiate the incorporation under the laws of this State until a direct proceeding to set aside and annul the certificate issued by the Secretary of State shall be instituted by the proper authority of this State, and all acts done and contracts entered into shall have the same force and effect as if no irregularity had existed.

"When the Secretary of State issues such a certificate such foreign railroad corporation and its stockholders, owners and projectors shall *ipso facto* become a domestic corporation, and shall *ipso facto* be incorporated under the laws of this State, and shall enjoy the rights and be subject to the liabilities of a domestic corporation and may sue and be sued in the Courts of this State, and shall be subject to the jurisdiction of this State as a corporation created under the laws of the State of South Carolina.

"If any such charter or any part thereof filed, as aforesaid, in the office of the Secretary of State shall be in contravention or violation of the laws of this State, such charter, or such parts thereof, so in conflict with the laws of this State, shall be without effect in this State."

The section of the State Constitution which it is alleged is violated by the statute is as follows, the writer dividing the section into subdivisions and adding the italics:

Section 8. (1) The General Assembly shall not grant *to any foreign* corporation or .association (a) *a license* to build, operate or lease any railroad in this State; but in all

cases where a railroad is to be built or operated, or is now being operated in this State, and the same shall be partly in this State and partly in another, or in other States, *the owners or projectors* thereof shall first become incorporated under the laws of this State (b) nor shall any foreign corporation or association lease or operate any railroad in this State, or purchase the same or any interest therein; (2) Consolidation of any railroad lines and corporations in this State with others shall be allowed only where the consolidated company shall become a domestic corporation of this State; (3) No general or special law shall ever be passed for the benefit of any *foreign corporation operating a railroad under any existing license* of this State or under any *existing lease,* and no grant of any right or priviliege, and no exemption from any burden shall be made *to any such foreign corporation,* except upon the condition that the *owners or stockholders thereof* shall first organize a corporation in this State under the laws thereof, and shall thereafter operate and manage the same and the business thereof under said domestic charter."

It seems clear that subsection 2 and 3 of the quoted section above are not involved in this controversy, as no consolidation of any railroad lines and corporations in this State with others is proposed now, and as the statute in question is not a general or special law for the benefit of any foreign corporation operating a railroad under any *existing* license or lease of this State and therefore the petitioning foreign corporation is not *such* a corporation as is within the intent of the provision. It further appears that the terms of the demurrer limit the inquiry to the question whether the statute violates the first portion of the quoted section, or subsection 1 as indicated.

We do not think the statute violates this provision.

First. There is a plain distinction between a *license* to a foreign corporation to build, operate or lease any railroad in this State, and the *grant of a charter* creating a *domestic*

corporation and granting to such *domestic* corporation power to build, operate or lease any railroad in this State. In the first case the foreign corporation maintains its entity and as such carries on its business here, but in the second case a new entity is created which is not a foreign corporation but a domestic corporation.

All the authorities show that when a foreign corporation complies with a statute such as ours it becomes a domestic corporation: *Southern Railway* v. *Tompkins,* 48 S. C., 49, 25 S. E., 982; *Mathis* v. *Southern Railway,* 53 S. C., 257, 31 S. E., 240; *Calvert* v. *Ry.,* 64 S. C., 139, 36 S. E., 750; *Wilson* v. *Ry.,* 64 S. C., 162, 36 S. E., 701; *Geraty* v. *R. R. Co.,* 80 S. C., 361, 60 S. E., 936; *Debman* v. *Southern Bell Tel. Co.* (N. C.), 26 S. E. Rep., 269; *Leyden* v. *Endowment etc.* (N. C.), 39 S. E. Rep., 47; *Allison* v. *Southern Ry.* (N. C.), 40 S. E. Rep., 91; *Davis, Adm.* v. *Chesapeake & Ohio Ry.* (Ky.), 70 S. W., 857; 75 S. W., 275; *Stout* v. *Sioux City etc.* (Neb.), 8 Fed. Rep., 794; *Walters* v. *Chicago, etc. Ry.* (Neb.), 104 Fed. Rep., 377; *Russell et al.* v. *St. Louis S. W. R.* (Ark.), 75 S. W. 725; *Southern Ry. Co.* v. *Allison,* 23 Sup. Ct. Rep., 717, and other cases of the Supreme Court of the United States recognize that compliance with such a statute would make a domestic corporation for all purposes, except federal jurisdiction. The Wilson and Calvert cases, *supra,* do not shake the decision in the Tompkins case, *supra,* and in *Geraty* v. *R. R. Co., supra,* Mr. Justice Gary, speaking for the Court, said: "But whether the foreign corporation is incorporated as a domestic corporation where it accepts a charter or files a copy of its charter granted by another State with the Secretary of State, it has not been denied that it becomes a domestic corporation for all purposes except federal jurisdiction," citing *Southern Ry.* v. *Tompkins* and *Calvert* v. *Ry.* If there is a decision anywhere to the contrary, it has not been called to the attention

of the Court, and we assume the proposition is beyond con-
troversy.

If this be so, no license is proposed to be granted to a
foreign corporation, but what is sought is the charter of a
domestic corporation.

Whether such a corporation, nevertheless, may have the
right to remove causes to the Federal Court under the rule
declared in *Railroad Co.* v. *James,* 161 U. S., 545 ; *Ry. Co.*
v. *Louisville Trust Co.,* 174 U. S., 552; *Southern Ry.* v.
*Allison,* 190 U. S., 226, is wholly irrelevant to the question
at bar.    The question is whether the petitioners could
become a domestic corporation in harmony with the State
Constitution, and not whether such corporation would have
right of removal.

As to the first question, we are controlled by our own
decisions, as to the second, we may have opinions, but we
have no authority to finally determine, but must follow the
conclusions, whatever they be, of the highest.Federal Tribu-
nal, the final arbiter in such matters.   As it was not in the
power of the constitutional convention, nor in the legisla-
ture, to control the Federal Courts in the determination of
Federal questions, we will not read into the section of the
Constitution any such purpose, but will confine ourselves
to the ascertainment of the meaning of the Constitution, to
be deduced from the language used.

What is the meaning of the word "railroad" and the
words "owners or projectors thereof?"

We do not understand "railroad" as used in this section
to mean railroad company or corporation, but it refers to
the property fairly falling within the term railroad, includ-
ing track, rolling stock, station houses and generally such
property as is usual, incident, or necessary to the operation
of a railroad, doubtless including all franchises when con-
ferred.    *United States v. Denver etc.,* 14 Sup. Ct. Rep., 11;
7 Words and Phrases, 5900-1.

22—84

By section 2024 "railroad" in that chapter must be construed to mean "a railroad or railway operated by steam" and "railroad corporation" or "railroad company" means "all corporations, companies or individuals now owning or operating, or which may hereafter own or operate any railroad in whole or in part in this State." Sometimes by a mere figure of speech we speak of a railroad company or corporation as a railroad, but the connection in which it is used indicates the meaning. Here the connection clearly shows the meaning to be the railroad line or track and its essentials. "Thereof" clearly refers to "railroad."

The Constitution, therefore, provides that where a railroad is to be built or operated in this State, and the same shall be partly in another, the owners or projectors thereof shall first become incorporated under the laws of this State. The term "owners" applies more especially to those who have the right of property in a tangible railroad in existence in such form as to constitute the subject of ownership. Projectors of a railroad not in existence as distinguished from owners are those who project, plan or promote the prospective railroad, or if you please the prospective corporation. Who then are the owners or projectors of the line of railroad in process of construction up to the State line, and who are the projectors of the prospective continuation of such railroad line into South Carolina, and of the plan to acquire the necessary charter from South Carolina? It is manifest that the petitioner is one of such projectors. It is so alleged in the petition and admitted by the demurrer. We see no difficulty in declaring that a foreign corporation acting through its directors or managing officers may "project" the building of a railroad into another State and the plan to become a corporation of that State. Hence it cannot be said that the fact that the Carolina, Clinchfield & Ohio Railway signed the petition and prayed to be created with others into a South Carolina corporation was in violation of

the Constitution, which requires such owners or projectors to become incorporated in this State.

Section 19, art. IX, does not prohibit one corporation from holding stock in a State corporation, the prohibition is against holding a majority of the stock.

The manner of organizing domestic corporations is exclusively within legislative powers. If the legislature, in the matter of domesticating foreign corporations, chooses to adopt an existing organization, we see no constitutional inhibition. If this does not prove satisfactory the charter is subject to amendment.

But it is said the section of the Constitution further provides that no foreign corporation or association shall lease or operate any railroad in this State or purchase the same, or any interest therein. This provision, we think, relates to any existing railroad, but if it should be construed as referring to a prospective railroad it must be construed in harmony with the requirement that the projectors of a prospective line of railroad, to be partly in this State and partly in another, must become incorporated under the laws of this State. The granting of the charter in this case would not confer upon the said Carolina, Clinchfield & Ohio Railway as a foreign corporation any rights in the prospective railroad as lessee or as purchaser of the same or any interest therein. The railroad is to be built, owned and operated by the South Carolina corporation as an entity distinct from the petitioners as the projectors thereof.

Suppose we should accept the construction that the *stockholder* of the foreign corporation must apply for a domestic charter, how would that relieve the difficulty, if other foreign corporations or associations were as matter of fact stockholders? It is not unreasonable to suppose that the constitutional convention knew that it was possible to be within the charter power of any foreign corporation to own stock in another. In that view the difficulty remains that if all stockholders must apply, then some foreign corpora-

tion may have to apply as such. It is sought to obviate this difficulty by saying that only those stockholders who are natural persons must petition for a charter in this State, and may become a new corporation. This would be giving, we think, an unwarranted construction to the language of the Constitution requiring the owners or projectors of a prospective railroad in this State to become incorporated. The case of the *Southern Ry.* v. *Tompkins,* and the other cases in this State cited above, distinctly hold that the constitutional provision is not violated by the grant of a domestic charter to a foreign corporation upon its own application. The cases cited held the Act of 1896 constitutional, which provided for the domestication of foreign railroad corporations by the filing of an authenticated copy of the charter. This act was supplanted by the act of February 25, 1902. Under said act of 1902, petitioners Lyles and Phlegar sought to be incorporated, and upon refusal of the Secretary of State to issue the charter, mandamus was sought to compel the same in the case of *Lyles* v. *McCown, Secretary of State,* 82 S. C., 127.

That statute required that the owners and stockholders of a foreign corporation should apply for a charter and become incorporated in this State in the manner provided in the act of February 28, 1899, which among other things, required books of subscription to the capital stock to be opened in this State, and not less than five hundred dollars per mile shall be subscribed by *bona fide* subscribers, and the organization of the company by election of officers.

A demurrer to the petition was sustained on the ground that the statute authorizing the incorporation had not been complied with in the particulars above mentioned. The Court declined to give assent to the contention then made that article IX, section 8 of the Constitution, and the statute passed in pursuance thereof, did not contemplate recognition of the organization by subscription of stock, payment of stock, election of officers and other steps in the organi-

zation already taken under a charter obtained from another State. There is, therefore, nothing in this last case antagonistic to the rule announced in the Tompkins case; on the contrary, that case was referred to and distinguished.

The legislature conceiving that a more practical method of incorporating foreign companies and their stockholders, owners and projectors was necessary, adopted the present statute, with which petitioners have fully complied.

Up to this point we have considered the question as if the foreign corporation alone is applying for a domestic charter.

In this case, however, natural persons join in the petition, and one of them is a resident citizen of this State, and the South Carolina corporation will be composed of natural persons. If, therefore, we should permit ourselves to inject irrelevant matter into the case and notice what seems the *bete noire* of the discussion, the right of removal to the Federal Court, that fact would distinguish the charter, if granted in this case, from the charter of adoption in the Tompkins case, and very probably it would come within the remarks of the Court in *R. R. v. James,* 161 U. S., 545, that, "In order to bring such an artificial body as a corporation within the spirit and letter of that Constitution, as construed by the decisions of this Court, it would be necessary to create it out of natural persons, whose citizenship of the State creating it, would be imputed to the corporation itself."

But whatever may be the result with respect to the matter of removal, the application in this case cannot be denied without overruling the Tompkins case and the cases which have followed it, as it is clear that the statute in question, if possible, is even more clearly within the Constitution than the statute sustained in that case.

The respondents rely upon the following language in *Southern Ry.* v. *Tompkins,* 48 S. C., 49, 52, 25 S. E., 982, as a basis for the overthrow of the statute in question: "What was the intention of the framers of the Constitu-

tion in adopting section 8 of article IX? The main object was to require foreign railroad companies to be placed on the same footing with domestic corporations as to their rights and liabilities under the jurisdiction of the State Courts."

This is attempted to be construed as if the Court was considering the question of removal of causes to the Federal Courts, whereas, no such question was before the Court. It is not usual to approve a quoted extract from an opinion interpreting the Constitution as a basis for overthrowing the opinion and interpretation.

A more reasonable construction of the language quoted, in the light of the conclusion to which it led, is to consider it as referring to the constitutional power to domesticate a foreign corporation, and to confer upon such domesticated corporation, the rights, and subject it to the duties and liabilities, of a domestic corporation. Among the principal rights thus conferred would be the power to condemn rights of way, and among the principal duties and liabilities would be to subject its domestic charter to alteration and repeal.

Other local rights and duties subject to the jurisdiction of State Courts might be mentioned, and give ample scope to the meaning of the quoted remarks, without imputing a meaning foreign to the question under consideration in that case, which was the power of the legislature to grant a domestic charter to a foreign corporation.

Under this view it is the plain, ministerial duty of the Secretary of State to issue the charter applied for, and writ of mandamus should issue.

CIRCUIT JUDGES PRINCE, MEMMINGER, ALDRICH *and* SHIPP *concur in this opinion.*

JUDGE MEMMINGER, *concurring:* I concur in the opinion of Chief Justice Jones.

There is certainly a reasonable doubt upon the construction to be placed on the constitutional provision in question,

and under the authorities, in such cases, that doubt must be solved in favor of the constitutionality of the act of the legislature passed thereunder.

I am especially impressed with the idea indicated therein that the Court, in seeking the intention of the framers of the Constitution, must assume that they could not have been unaware of or intended to ignore the fact that neither they nor the legislature had power to abrogate or control the power of the Federal Courts in the determination of Federal questions; and as it was not within the power of the convention to do so, we should not read into the Constitution made by them any such purpose.

Rights have become vested and enterprises projected upon the faith of the stability of the law as laid down in the Tompkins case, and it should not be overruled, and we should maintain the right to construe our own State Constitution without regard to what may be the decisions of the United States Courts upon Federal questions arising therefrom.

Where a question of construction is doubtful also, that one should be preferred which tends to upbuild the commonwealth than to break down and discourage enterprise and check progress.